NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS

## DIVISION ONE

IN RE KATHERINE N.

No. 1 CA-MH 18-0022
FILED 11-8-2018

Appeal from the Superior Court in Navajo County
No. S0900MH201800024
The Honorable David Joseph Martin, Judge *Pro Tempore*

**AFFIRMED**

COUNSEL

Navajo County Attorney's Office, Holbrook
By Jason S. Moore
*Counsel for Appellee*

Coronado Law Firm PLLC, Lakeside
By Eduardo H. Coronado
*Counsel for Appellant*

---

**MEMORANDUM DECISION**

Judge Randall M. Howe delivered the decision of the Court, in which Chief Judge Samuel A. Thumma and Judge Maria Elena Cruz joined.

---

**H O W E**, Judge:

¶1        K.N. appeals the trial court's order committing her to involuntary inpatient and outpatient mental health treatment. For the following reasons, we affirm.

**FACTS AND PROCEDURAL HISTORY**

¶2        Between December 2014 and January 2016, K.N. had been admitted to ChangePoint Psychiatric Hospital five times to undergo psychiatric treatment. Treatment records during that time show that K.N. was under court-ordered psychiatric treatment from January 2015 to January 2016 and that she was specifically advised to take psychotropic medication to treat her psychiatric symptoms. When that order expired, however, K.N. refused to take her medication and immediately disenrolled from the hospital's services.

¶3        While K.N. was in the Navajo County Jail on drug charges in March 2018, she exhibited bizarre behavior, such as accusing detention officers of killing her children, stating that the other inmates "need[ed] to die," and making salacious comments. Thereafter, K.N. was released from the jail and admitted to ChangePoint, for the sixth time, to undergo an emergency medical evaluation.

¶4        A nurse practitioner evaluated K.N. and determined that she suffered from paranoid schizophrenia. The nurse practitioner noted that although K.N. did not appear in acute physical distress, she suffered from audio and visual hallucinations, exhibited disorganized thinking and hyper-religiosity, and was incapable of answering questions intelligently.

¶5        Two ChangePoint psychiatrists, Drs. Worthen and Eltomi, also evaluated K.N., and they each diagnosed K.N. as suffering from Schizoaffective Disorder and found that K.N. was persistently and acutely disabled. They also found that K.N. suffered from delusions, paranoia, and hallucinations. Although K.N. denied to them that she suffered from a mental disorder, she insisted that Worthen had put her children in a freezer

and sexually molested them, and explained that "meth is made and being sold 'from ant droppings from their brain.'"

¶6　　　　After the evaluations, the Navajo County Attorney petitioned for court-ordered treatment of K.N., alleging that K.N. was persistently or acutely disabled. The petition sought combined inpatient and outpatient treatment. At the subsequent evidentiary hearing, the court heard testimony from the two examining physicians and other ChangePoint staff.

¶7　　　　Eltomi testified that K.N. had been previously hospitalized and medicated, had a history of being noncompliant with treatment, showed symptoms of mental illness, and would decompensate without treatment. Eltomi further noted that K.N. abused marijuana and methamphetamine—drugs that he explained are likely to worsen her condition. He also mentioned that although K.N. did not exhibit any behavior suggesting that she was a danger to herself or others, her previous lack of medication compliance and insight into her condition had caused her to become suicidal and threaten to murder her parents. Eltomi opined that K.N. suffered from Schizoaffective Disorder and stated that he had based his diagnosis on the notes of Worthen and his interview with K.N., during which she was "irrational, ranting at times," and "responding to internal stimuli, like hearing children's voices[.]"

¶8　　　　Eltomi also discussed K.N.'s ability to accept treatment voluntarily. He specifically stated that when he interviewed K.N., she did not believe that she needed medication or that she suffered from a mental illness. He affirmed that before a psychiatric patient will voluntarily accept treatment, she must typically understand the nature of her illness and the need for medication. He also noted K.N. failed to take her medication when she was not under court order. Eltomi therefore determined that K.N. was incapable of accepting voluntary treatment and would benefit from a combination of inpatient and outpatient treatment.

¶9　　　　Worthen testified that K.N. suffers from Schizoaffective Disorder, a mental illness that will cause her to experience disorder, bizarre thinking, and to "decompensate rather rapidly" without court-ordered treatment. Worthen also said that K.N. was "starting to unravel a little bit[.]" More specifically, he reported that K.N. recently accused another ChangePoint patient of "putting 666 on her" and stated that when she was at the Navajo County Jail "a guard stuck a fork in her butt and removed a hemorrhoid, and then . . . fed it to her."

¶10       Worthen also spoke about K.N.'s failure to accept treatment and comply with her medication regimen. He testified that the Navajo County Jail staff "were having a hard time with [K.N.] taking medication and being treated appropriately for her mental illness." He further testified that after examining K.N., he recommended that she take Risperdal twice per day, but that K.N. initially refused the medication and "said she didn't need [it]." He also reported that she complained that the Risperdal upset her stomach—an uncommon side effect. Nevertheless, he took K.N. off Risperdal and placed her on Abilify—a medication that is less therapeutic than Risperdal—to accommodate her complaint. Worthen further stated that despite her "history of noncompliance with medication regimens," K.N. has been "fairly compliant" with taking the Abilify and has refused it only on one occasion. He also expressed concern, however, that K.N. would not continue to take her medication because she is known to exhibit impaired judgment and insight. He further indicated that if K.N. did not take her medication on a set schedule, she would regress and "start having delusional thoughts[.]" Worthen thus recommended a combined inpatient and outpatient treatment plan and insisted that it would be the least restrictive treatment plan for K.N.

¶11       A ChangePoint psychiatric technician and K.N.'s social worker also testified at the hearing. The social worker testified that K.N. persistently denied needing treatment, was "mostly compliant" with taking her medication, but made several strange statements to her. As an example of a strange statement, the social worker recounted K.N.'s stating that her daughter was hanged at the Holbrook courthouse. The psychiatric technician also recounted a strange interaction that he had with K.N. He testified that even though K.N. is probably not pregnant, "she said that when she was in the jail that she was raped by a guard, and [that] she had a baby inside her . . . trying to crawl and get out[.]" On cross-examination, he further testified that "[K.N.] was starting to cooperate more" and that she has been calm lately.

¶12       After the hearing, the court found by clear and convincing evidence that K.N. was persistently and acutely disabled due to a mental disorder, in need of treatment, and is either unwilling or unable to accept voluntary treatment. The court ordered combined inpatient and outpatient treatment for no more than 365 days, with inpatient treatment not to exceed 180 days. The court further determined that the ordered treatment plan was the least restrictive alternative. K.N. timely appealed.

## DISCUSSION

### 1. Sufficiency of Evidence Under A.R.S. § 36–540(A)

¶13        K.N. contends that the trial court erred by finding that she suffered from an acute and persistent disability and that she was unwilling or unable to accept voluntary treatment. This Court will not disturb a trial court's involuntary commitment order that the evidence substantially supports. *In re Pima Cty. Mental Health No. MH–1140–6–93*, 176 Ariz. 565, 566 (App. 1993). We view the facts in the light most favorable to sustaining the trial court's decision and will not set aside its factual findings unless those findings are clearly erroneous. *In re Mental Health Case No. MH 94–00592*, 182 Ariz. 440, 443 (App. 1995). The interpretation and application of a statute, however, is reviewed de novo. *In re MH2010–002637*, 228 Ariz. 74, 78 ¶ 13 (App. 2011).

¶14        A court may order an individual to undergo involuntary mental health treatment if it finds by clear and convincing evidence that the individual is either unwilling or unable to accept voluntary treatment and, as a result of a mental disorder, is a danger to self or others, has a persistent or acute mental disability, or a grave disability. A.R.S. § 36–540(A). Under A.R.S. § 36–501(32), a "persistent or acute disability" means a severe mental disorder that meets the following criteria:

(a) If not treated has a substantial probability of causing the person to suffer or continue to suffer severe and abnormal mental, emotional, or physical harm that significantly impairs judgment, reason, behavior or capacity to recognize reality.

(b) Substantially impairs the person's capacity to make an informed decision regarding treatment, and this impairment causes the person to be incapable of understanding and expressing an understanding of the advantages and disadvantages of accepting treatment and understanding and expressing an understanding of the alternatives to the particular treatment offered after the advantages, disadvantages and alternatives are explained to that person.

(c) Has a reasonable prospect of being treatable by outpatient, inpatient or combined inpatient and outpatient treatment.

¶15        In this case, the evidence is sufficient to satisfy the first criterion for finding K.N. persistently or acutely disabled. The testimony from two physicians, a nurse practitioner, and a psychiatric technician clearly show that K.N. is profoundly paranoid and delusional and that her paranoid delusions have led to her recurring hospitalization and irrational behavior. Furthermore, Eltomi and Worthen's testimony and affidavits indicated that K.N. suffered from Schizoaffective Disorder and that she had a history of refusing medication. Both physicians also thought that if K.N. were not under a court order for treatment, she would likely decompensate. In addition, Eltomi reported that K.N. suffered from a substance abuse problem that could worsen her condition. Accordingly, substantial evidence supports finding that K.N.'s mental disorder will cause her to suffer further harm if left untreated.

¶16        Substantial evidence also supports the second criterion for finding K.N. persistently or acutely disabled. As the record reflects, K.N. has resisted medical treatment on several occasions and has stated numerous times that she does not believe that she has a mental illness. As such, the record is sufficient to support the trial court's finding that K.N. lacks the capacity to make an informed treatment decision.

¶17        K.N. contends nonetheless that she cannot be classified as having a persistent or acute disability because she has been cooperative with her treatment at ChangePoint, willingly and voluntarily complied with her medication plan, and "participated, even if partially, in the development of her treatment plan." This argument fails because, as established above, K.N. clearly has a history of being violent and medically noncompliant. *See MH 94–00592*, 182 Ariz. at 444 ("In evaluating a patient's mental condition, physicians not only examine the patient's current behavior and statements, but also consider his treatment history and past behavior. Consideration of current behavior alone would be manifestly misleading."). Moreover, the evidence of K.N.'s compliance with her treatment regimen occurred in a supervised and structured environment and even then, her compliance has been inconsistent. *See id.* at 444–45 ("A patient may not display any current aberrant behavior because of intensive therapy, supervision, and medication and yet pose a danger of harm to himself because of inability to make treatment decisions if released from the therapeutically structured environment."). As such, K.N.'s argument is not persuasive.

¶18        In a related argument, K.N. claims insufficient evidence supports the trial court's finding that she is unwilling or unable to accept voluntary treatment. The record shows, however, that although K.N. has

been repeatedly advised that she must take medication for her condition, she has failed to do so when she is not subject to court order. Furthermore, K.N. has persistently denied having any mental illness and that she needs medication. Thus, sufficient evidence supports the trial court's finding.

## 2. Least Restrictive Treatment Alternative

¶19　　　K.N. argues that the trial court erred by finding that the treatment plan it ordered is the least restrictive treatment alternative. We review the interpretation and application of statutes involving involuntary commitments de novo. *MH2010–002637*, 228 Ariz. at 78 ¶ 13. Under A.R.S. § 36–540(B), the court must consider all available and appropriate treatment alternatives for a patient and must order the least restrictive treatment alternative available. The "[l]east restrictive treatment alternative" is "the treatment plan and setting that infringe in the least possible degree with the patient's right to liberty and that are consistent with providing needed treatment in a safe and humane manner." A.R.S. § 36–501(21).

¶20　　　Here, both examining physicians testified that the court-ordered treatment plan was the least restrictive alternative for K.N. The physicians concluded that, due to K.N.'s history of noncompliance with medical treatment, both inpatient and outpatient treatment is the most appropriate alternative. Moreover, Worthen specifically expressed concern that K.N. would not continue to take her medication because she is known to exhibit impaired judgment and insight. Eltomi also indicated that if K.N. left ChangePoint without a treatment order in place, her condition would get worse. In light of the physicians' testimony, the court-ordered treatment plan is the least restrictive alternative for K.N.

¶21　　　K.N. suggests that the more appropriate treatment plan for her would be outpatient treatment. The record does not mandate this conclusion. The record instead shows that K.N. has a history of medical noncompliance and that she is compliant with her treatment plan and medication regimen only when she is at ChangePoint. As such, K.N.'s argument is not persuasive.

## CONCLUSION

¶22       For the foregoing reasons, we affirm.



AMY M. WOOD • Clerk of the Court
FILED: AA